# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UPPER CHATTAHOOCHEE RIVERKEEPER FUND, INC.; THE CHATTAHOOCHEE RIVERKEEPER, INC.; and W. ROBERT HANCOCK, Jr., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:95-CV-2550-TWT |
| THE CITY OF ATLANTA, | |
| *Defendant*. | |
| THE UNITED STATES OF AMERICA AND THE STATE OF GEORGIA, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:98-CV-1956-TWT |
| THE CITY OF ATLANTA, | |
| *Defendant*. | |

## DEFENDANT THE CITY OF ATLANTA'S
## BRIEF IN SUPPORT OF ITS PETITION FOR REVIEW OF
## PLAINTIFF THE UNITED STATES OF AMERICA'S WRITTEN
## RESPONSE AND DEMAND OF STIPULATED PENALTIES

Defendant the City of Atlanta (the "City") files this petition for review of Plaintiff the United States of America's demand of $485,000 in stipulated penalties under the Consent Decree for the City's construction of a pathway (the "Project") to connect two City parks in a historically underserved community. Instead of joining the City to facilitate construction of this important public amenity, the United States has erected needless obstacles that have caused the Project to languish for years and seeks to impose a hefty penalty that is contrary to the Consent Decree.

The Project is being constructed on a 0.67-acre property that the City acquired pursuant to the Greenway Acquisition Project in the Consent Decree. The Project is consistent with the Consent Decree, which allows the City to construct public access facilities on greenway properties to promote various benefits. Those benefits include environmental justice, as well as environmental education, quality of life, and recreation, health, and fitness. The facilities must be "designed and constructed with non-point source pollution prevention as a primary consideration" and are subject to United States Environmental Protection Agency ("EPA") and Georgia Department of Natural Resources, Environmental Protection Division ("EPD") approval.

Due to an unknown technical issue leftover from a cyberattack on the City that caused, among other issues, greenway property designations to be hidden from contractor and City review, a City contractor began construction of the Project without the City having sought approval from EPA and EPD. Upon learning of the

property's greenway status, the City paused the Project and requested approval.  The City showed the Project was designed with non-point source pollution prevention as a primary consideration and would further the many other benefits recognized by the Consent Decree.  A year later, EPA—without EPD—unreasonably refused to grant approval.  EPA expressed its preference for a smaller trail to encourage less foot traffic, contrary to the benefits of a pathway to connect underserved communities to park resources.  EPA also demanded a $485,000 penalty, contending the City violated the Consent Decree because it did not seek pre-approval and the Project did not comply with the Consent Decree's public access facility guidelines.  EPD separately informed the City it believed the Consent Decree permits retroactive approval of the Project with certain modifications and that a penalty is inappropriate.

After EPA for another year continued to demand revisions not required by the Consent Decree and refused to rescind the penalty, the City was forced to initiate a dispute resolution process.  EPA then approved completion of the trail with revisions but continued to demand a penalty.  EPD maintains it is not party to this dispute.

The Project is protective of water quality and is consistent with the Consent Decree's guidelines for public access facilities.  EPA's positions are predicated upon its misreading of the Consent Decree and could not possibly justify EPA's attempt to impose a $485,000 penalty upon the City.  The City therefore files this petition seeking relief from EPA's unreasonable conduct and demands.

2

The City asks the Court to enter an order providing the following declaration:

1. The Consent Decree does not authorize a stipulated penalty because the Project—including as originally designed and constructed prior to the City's approval request—complies with the public access facility guidelines and is protective of water quality, and the Consent Decree permits retroactive approval of public access facilities.

2. In the alternative, the penalty is unenforceable because it bears no relation to what at most constitutes a non-material violation of the Consent Decree—not seeking *pre*-approval—that does not harm the environment.

3. The Consent Decree does not allow interest on any stipulated penalty here.

The City requests an in-person hearing to address these issues and stands ready to present witnesses to explain how the Project is protective of water quality.

## FACTUAL BACKGROUND

I. **The Parties Entered Into a Consent Decree That Provides the City the Right to Construct Public Access Facilities on Greenway Properties.**

A.  The Consent Decree Provides for the Greenway Acquisition Project.

The parties to this action executed a Consent Decree, which the Court entered on September 24, 1998.  Dkt. 10 in No. 1:98-CV-1956-TWT; Dkt. 135 in No. 1:95-CV-2550-TWT ("CD").  Among other things, the Consent Decree provides for a Supplemental Environmental Project (the "SEP"), which consists of the Greenway

Acquisition Project and the Stream Cleanup Project that expressly "include an environmental justice component."  CD § VIII(B).  Only the first project is at issue.

The City agreed "to acquire and maintain protected areas called Greenway Properties along selected portions of 'Designated Streams'" and to "hold the Greenway Properties in perpetuity . . . for the purpose of improving, restoring and protecting the water quality of the Designated Streams."  CD § VIII(D)(1).  The Consent Decree required the City to prepare a Greenway Acquisition Plan (the "GAP") for EPA/EPD approval, CD § VIII(D)(2), and then to implement the GAP by March 31, 2007, CD § VIII(D)(2)(l).  The City agreed to "maintain the Greenway Properties in a manner that preserves environmental value and furthers the purposes of the Greenway Acquisition Project."  CD § VIII(D)(2)(p).

The Consent Decree allows the City to develop up to 10% "of the area of Greenway Properties . . . for public access or use, such as bicycle and hiking paths." CD § VIII(D)(2)(j)(iv).  The Consent Decree provides: "Bicycle and hiking trails, canoe launch ramps, and picnic facilities and other public access facilities located within Greenway Properties shall be designed and constructed with non-point source pollution prevention as a primary consideration.  Location and construction of such facilities shall be subject to the approval of EPA/EPD."[1]  CD § VIII(D)(2)(n).  EPA

---

[1] The Consent Decree states that "[w]hen a task or responsibility is given to 'EPA/EPD' in this Consent Decree, the term means 'EPA and EPD' unless the Government Plaintiffs jointly elect (in their unreviewable discretion) to assign a

and EPD expressly "agree[d] to use their best efforts to expeditiously review and comment on all documents, plans and other deliverables that the [City] is required to submit to EPA/EPD for approval."  CD § XIX(B).

B.  The Greenway Acquisition Plan Provides Flexible Guidelines for Public Access Facilities.

Greenway Properties, including public access facilities, serve many benefits. EPA and EPD approved the GAP on March 29, 2001.  Smith Decl., Ex. K (the GAP). The GAP "focus[es] on advancing the primary purpose of the Greenway Acquisition Project" while furthering "other benefits" if they do not conflict with that purpose, including promoting: "environmental education," "recreation, health, and fitness," "quality of life;" and "environmental justice."  GAP § 2.1.  The GAP recognizes that public access fosters these benefits, as "allowing public access to the streams protected through the [GAP] will encourage environmental education as well as community enjoyment and appreciation of the Greenway System."  GAP § 7.1.

The GAP includes flexible public access facility guidelines.  The GAP provides "design and construction standards . . . which, if followed, would ensure that the water quality and habitat benefits of the Greenway System are not compromised."  GAP § 8.1.1.  Those standards include suggestions for facility

---

particular task or responsibility to one of them."  CD § XIX(C).  To do so, "the Government Plaintiffs shall notify the [City] in writing of the task or responsibility that EPA or EPD is assigned."  *Id.*

placement, design and construction, and signage, lighting, and fencing. GAP §§ 8.3–8.7. The GAP is clear, however, that the "standards are provided to guide the City," emphasizing that "no one single design solution can be stipulated" and "different facility designs will be needed to accommodate [a] range of conditions." GAP § 8.6. The same is true as to "buffer zones and setbacks" that are "intended to provide guidance to the City," but for which the GAP expressly states "the City is not bound by these buffer zone standards" and may grant "waivers" from setbacks in its "best professional judgment." GAP §§ 8.3–8.4. The GAP provides the City with flexible guidance to ensure Greenway Properties are "designed and constructed with non-point source pollution prevention as *a* primary consideration," CD § VIII(D)(2)(n) (emphasis added), while advancing their many important benefits.

C.    The City Has Complied with the Consent Decree and Successfully Implemented the GAP.

The City has made substantial progress over two decades in achieving the objectives of the Consent Decree. *See* Dkt. 208 at 7–10. This also is true as to the GAP, pursuant to which the City acquired nearly 2,000 acres of Greenway Properties by 2007. Smith Decl., Ex. L; Dkt. 208-6. The Court previously stated "the City is to be commended for its expenditure of over $31 million" for the SEP. Dkt. 208-7. The City has complied with the Consent Decree, and the GAP, for over twenty years.

Including the Project, public access makes up 0.13% of Greenway Property acreage, Smith Decl., Ex. C at 10, well below the 10% limit, CD § VIII(D)(2)(j)(iv).

D.   <u>EPA and EPD Proposed New Public Access Facility Standards in 2010 That Did Not Modify the GAP.</u>

In connection with an approval request, EPA and EPD sent the City a letter on December 16, 2010 with "Amended Standards for Public Access Trails in Greenway Properties" that EPA and EPD stated "amend the existing requirements" of the GAP (the "2010 Letter"). Smith Decl., Ex. M. The letter purported to require, among other things, that the City provide "compelling evidence" that a soft-surface trail is "not sufficient to meet specific user needs" if a hard-surface trail is proposed, as well as trail width, stormwater capture, signage, and maintenance criteria. *Id.* The City responded with counterproposals and inquired "whether and how to incorporate" the proposals into the GAP. Smith Decl., Ex. AA. EPA and EPD never responded to the counterproposal or "whether and how to incorporate" the proposals.

## II.   The City Commenced and Sought Retroactive Approval of the Project.

The Project is designed to connect two parks in an underserved community. The City received a grant to, in pertinent part, provide "[f]unding to design and build one access pathway for the Grove Park community to align with the expected Park opening . . . , which is a top community priority." Smith Decl., Ex. MM. The pathway would create a safe walking connection between Grove Park and the surrounding neighborhoods (including recreation, health, and learning centers) to Westside Park using a pedestrian bridge over Proctor Creek and a concrete trail through the City-owned property at 775 Hortense Way, NE, Atlanta, Georgia 30318

7

(the "Property"). Smith Decl., Exs. A, F, H. The City purchased the Property in 2004 and held it as a Greenway Property. Smith Decl., Ex. II. The Project would provide an important amenity to improve quality of life and promote environmental justice for an underserved community. Smith Decl., Exs. A, F, H.

The City commenced the Project in January 2021 and paused it in April 2021. A City Department of Parks and Recreation ("DPR") contractor began work on January 4, 2021. Smith Decl., Ex. C. The Property is approximately 0.67 acres, and the pathway would be 2,038 square feet. *Id.* The City Department of Watershed Management ("DWM"), which oversees the Greenway Properties, learned of the work on or about February 26. *Id.* After investigating and inspecting the Project, the City paused work on April 7. *Id.* The contractor had installed and maintained erosion and sediment controls, completed the bridge, conducted certain tree and vegetation removal, and planted new trees. *Id.* The contractor had not yet constructed the trail. *Id.* During its investigation, DWM learned that the Greenway Property layer of the Atlanta Geographic Information System ("Atlanta GIS") had not been reactivated for contractor view after the City fell victim in 2018 to "one of the most sustained and consequential cyberattacks ever mounted against a major American city." *Id.*; *see also* Smith Decl., Ex. SS. The contractor thus was unaware the Property was subject to the GAP, as was City staff in conducting plan reviews. *Id.* The City confirmed no other properties had been affected. *Id.*

8

To ensure construction on Greenway Properties would not reoccur without the City's review under the GAP, the City updated its online mapping tool to identify greenway properties in red and labeled with "NO LAND DISTURBANCE." Smith Decl., Exs. C, MM. The City also sent the updated Atlanta GIS greenway layer and the GAP to DPR and partner organizations, and it provided updated Greenway Property training materials to DWM teams. Smith Decl., Ex. MM.

On April 26, 2021, the City provided written notice of the Project to EPA and EPD and requested "retroactive approval for the work already performed at the Property and approval to finish that work in accordance with the attached statement of work and plans," showing that "the plans and work satisfy Sections 7 and 8 of the [GAP]" and are protective of water quality in Proctor Creek. Smith Decl., Ex. C.

## III. EPA Rejected the Project and Imposed $485,000 in Stipulated Penalties.

EPA responded almost a year later, stating the Project "does not meet the criteria" in the GAP "and cannot be retroactively approved." Smith Decl., Ex. D. EPA declared the Property "should not be used as a major route between the two City Parks Department facilities" and expressed its preference for "a narrower trail for limited traffic." *Id.* EPA also "demand[ed] $485,000" for "the unauthorized disturbance of a Greenway parcel." *Id.* EPD informed the City otherwise, however, communicating during multiple phone calls that it believed the Consent Decree permits retroactive approval of the Project with certain modifications and that a

penalty is inappropriate.  Despite the Consent Decree's requirement that EPA and EPD must notify the City in writing that they have assigned review of the City's approval request to a single agency, *see* CD § XIX(C), EPA and EPD never did so.

The Consent Decree states the City "shall pay stipulated civil penalties for each day that it fails to meet any of the milestones or requirements set forth in Paragraph[ ] . . . I . . . of this Section within thirty days of receiving a written demand from EPA or EPD."  CD § XI(A); *see also* CD § XI(I)(2).  It appears EPA calculated the penalty from January 4 (work commenced) to April 7 (work paused).  A penalty accrues interest under 28 U.S.C. § 1961 "from the original due date."  CD § XI(O).

## IV.    The City Spent Over a Year Attempting to Address EPA's Concerns.

The City worked in good faith to secure approval of the trail to complete a significant amenity for an underserved community.  The City and EPA met on June 2, 2022, at which time the City provided context for the Project, including the environmental justice aspects and its importance to the community, and requested EPA reconsider and rescind the penalty.  EPA responded that it would consider the new information and the City's request to rescind the penalty.

The City provided an amended plan on July 29, 2022 that included a revised trail grade and added more bioswales, shrubs, and grasses.  Smith Decl., Ex. F.  The City offered these changes in good faith at EPA's request, but they are not required by the GAP.  Over four months later, EPA again denied approval of the trail.  Smith

Decl., Ex. G.  EPA continued to express its preference for a soft-surface trail and demanded even more actions not required by the GAP, such as additional replanting and adherence to the 2010 Letter.  *Id.*  The City responded on February 6, 2023, redesigning the proposed trail yet again.  Smith Decl., Ex. H.  On March 2, the Chattahoochee Riverkeeper, a party to the Consent Decree, "express[ed its] support for the City's request to [EPA] for retroactive approval."  Smith Decl., Ex. I.  During a site visit on April 20, EPA communicated it would not rescind the penalty demand.

## V.  The City Triggered the Consent Decree's Dispute Resolution Procedures.

On May 26, 2023, understanding EPA would maintain its penalty demand and having not received a response to the trail redesign, the City sent notice of formal dispute resolution under the Consent Decree.  Smith Decl., Ex. A.  EPA responded by requesting even more modifications not required by the GAP and stating "[w]e can negotiate the disputes on stipulated penalties . . . in parallel with discussions on the trail proposal."  Smith Decl., Ex. P.  The City agreed to some redesign demands, Smith Decl., Ex. OO, and provided EPA with a letter from Francis Kung'u, PhD PE, a civil engineer and an author of the GAP, Smith Decl., Ex. NN.  Dr. Kung'u opined that "the pedestrian bridge and proposed trail are entirely consistent with the GAP," which included the trail "as originally proposed when the City first sought approval of the EPA and the EPD in April 2021."  *Id.*  EPA approved the trail on August 14, and EPD did so on August 16.  Smith Decl., Exs. JJ, LL.

EPA provided its written position on August 16, 2023.  Smith Decl., Ex. N; *see* CD § XIII(F).  EPA contends the City breached the Consent Decree because it did not seek pre-approval of the Project and because the construction of the Project between January 4 and April 7, 2021 did not comply with the GAP.  Smith Decl., Ex. N.  EPD has stated it "is not taking part in this dispute."  Smith Decl., Ex. QQ.

The City files this Petition and attaches evidence exchanged during the dispute resolution period.  *See* CD § XIII.[2]  The City also provides the Declaration of Francis Kung'u, PhD PE ("Kung'u Decl."), "for the purpose of explaining technical matters in the record" showing the Project protects water quality.  *Id.*  The Court retained jurisdiction to resolve such petitions.  CD §§ XIII(A), XIII(B); *see also* CD § XXIII.

In finalizing this Petition, the City learned that EPA and EPD inadvertently were provided versions of Project documents different than those the City permitted and the contractor used in constructing the Project.  Smith Decl. ¶¶ 48–49.  EPA and EPD consented to supplementing the record with the permitted documents.  Smith Decl. ¶ 50, Ex. TT; CD § XIII(H).  The differences between plan versions primarily relate to changes to a proposed sidewalk near the Property before the City permitted

---

[2] The parties extended deadlines for EPA's position, the City's Petition, and EPA's response.  Smith Decl., Exs. QQ, TT.  The Court can take judicial notice of the government and newspaper websites in Exhibits RR and SS to Mr. Smith's Declaration, even though they were not exchanged previously.  *See FAS Cap., LLC v. Carr*, 7 F. Supp. 3d 1259, 1266 (N.D. Ga. 2014); *Hargon v. Homeward Residential, Inc.*, 2013 U.S. Dist. LEXIS 201771, at *7 (N.D. Ga. July 26, 2013).

the Project and the City's granting of a buffer variance.  Smith Decl. ¶ 49, Exs. UU, VV, WW.  The City relies upon the permitted documents to show that the Project is consistent with the GAP, although all plan variations lead to the same result.

**ARGUMENT**

## I. Contract Principles Govern the Dispute.

Courts interpret a consent decree the same as a contract, focusing on its plain language meaning.  "The rules we use to interpret a consent decree are the same ones we use to interpret a contract—since a consent decree is a form of contract." *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000).[3]  The Court thus looks past the four corners of the consent decree only if it is ambiguous.  *Id.* at 1313, 1316.

A court will enforce a consent decree only if it unambiguously mandates an obligation.  "Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees.  A district court may not impose obligations on a party that are not unambiguously mandated by the decree itself."  *Id.* at 1312 (citation omitted).  A court must follow "the Supreme Court's instruction that any command of a consent decree or order must be found within its four corners, and not by

---

[3] Because the United States is party to the Consent Decree, federal common law applies.  *Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir. 1986).  "When applying federal common law to contract cases, courts generally look to the *Restatement (Second) of Contracts* for guidance."  *Arguelles v. Dep't of Homeland Sec.*, 2023 U.S. Dist. LEXIS 14712, at *10 (M.D. Ga. Jan. 27, 2023) (citation omitted).  The Court also may look to state law for assistance.  *Begner v. United States*, 428 F.3d 998, 1004–05 (11th Cir. 2005).

reference to any purposes of the parties or of the underlying statutes." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1031 (11th Cir. 2002) (citation omitted).

## II.   The Consent Decree Does Not Allow for Stipulated Penalties Here.

### A.   The Project Complies with the GAP.

The Project was designed and constructed with non-point source pollution prevention as a primary consideration.[4]  EPD has certified the City as an issuing authority under the Erosion and Sedimentation Act of 1975, O.C.G.A. § 12-7-1 *et seq.*, and EPD's rules for erosion and sediment control in Ga. Comp. R. & Regs. 391-3-7-.09.  Georgia law thus charges the City with reviewing land disturbance applications ("LDA"), and the City cannot issue a permit unless it "affirmatively determines" the erosion and sediment control plan includes sufficient measures to prevent surface runoff, erosion, and sediment discharges.  O.C.G.A. § 12-7-9(b); City of Atlanta Soil Erosion, Sedimentation, and Pollution Control Ordinance § 74-39(c)(2).  The City contractor prepared an Erosion and Sediment Control Plan. Smith Decl., Ex. UU.  The City issued a permit with a buffer variance, Smith Decl., Exs. RR, UU, showing the plan complies with code requirements.  The City

---

[4] Non-point source pollution primarily consists of surface water runoff that can cause erosion and carry sediment into rivers or creeks.  Kung'u Decl. ¶ 11.  "Vegetation, as well as other preventative measures such as mulch and rip rap (a layer of stones or other rocky material used to stabilize soil), generally are effective in controlling erosion and sedimentation that can result in non-point source pollution."  *Id.* "Temporary erosion and sediment measures, such as silt fences and mulch, can protect against non-point source pollution during construction."  *Id.*

contractor installed, inspected, and maintained these controls during construction. Smith Decl., Ex. C at 6. The design, installation, and maintenance of these controls, which includes silt fencing and mulching, "reduced or completely eliminated erosion and sedimentation and protected water quality from non-point source pollution during construction activities at the property." Kung'u Decl. ¶ 12.

The proposed replanting and revegetation after construction of the Project likewise would sufficiently guard against non-point source pollution. The contractor removed no trees near the streambank. *Compare* Smith Decl., Ex. PP *with id.*, Ex. WW. The trees removed were located roughly 100 feet or more from the streambank, *id.*, a distance that more readily allows for disturbance and replanting without compromising the stream, *see* GAP §§ 8.4, 8.5. The tree replanting and revegetation "reduced and continues to reduce the potential for non-point source pollution from entering Proctor Creek." Kung'u Decl. ¶ 13. These measures are consistent with the design and construction standards in Section 8.6 of the GAP, as well as the guidelines to minimize construction impacts in Section 8.7.

The Project also complies with the GAP guidelines for bridges and multi-use trails. The width of the stream where the bridge was constructed is over 20 feet, the bridge was pre-fabricated, its height and length were determined by 100-year flood stage clearance levels, and it crosses the stream at approximately 90 degrees. GAP § 8.6.2.5; *see also* Smith Decl., Ex. C at 6; Kung'u Decl. ¶ 17. The trail was

designed to be 8-feet wide and would be placed in an area that required removal of a limited number of trees.  GAP § 8.6.3; *see also* Smith Decl., Exs. C at 6–7, PP, VV, WW.  The GAP states that hard surface trails (such as concrete or asphalt) may be used when necessary "to prevent erosion or meet specific user needs."  GAP § 8.6.  User needs—including pedestrians and people using bicycles, skateboards, scooters, strollers, and other small-wheeled devices—between two parks demand a robust trail design with durable material, and, as the GAP recognizes, concrete "is less invasive" and "will also last longer with lower maintenance than asphalt."  GAP § 8.6.3.3(B).

The Project would provide a safe connection between two City parks and the surrounding neighborhood for bikers and pedestrians, offering an important amenity to an underrepresented community.  Smith Decl., Exs. A, F, H.  The Project promotes "environmental justice," "environmental education," and "recreation, health, and fitness," which will greatly "improve quality of life" for the community, GAP § 2.1—all vital public access facility functions that the GAP promotes to encourage "community enjoyment and appreciation of the Greenway System," GAP § 7.1.

In its written position, EPA contends the trail design "did not meet the criteria in the Consent Decree's [GAP]" and "likely increased non-point source pollution" for five principal reasons.  Smith Decl., Ex. N at 13–15.  Each reason fails.

*First*, EPA argues "the City cleared the vegetation and trees that served as a buffer to reduce non-point source pollution."  Smith Decl., Ex. N at 13–14.  The

removed trees were roughly 100 feet from the streambank.  *See supra* 15.  While the GAP provides that "buffer zones and setbacks" simply "provide guidance" and "the City is not bound by" the guidance, GAP § 8.4, even those guidelines contemplate "[l]imited clearing and grubbing" for "passive recreation needs" outside of 50 feet from the streambank, GAP § 8.4.2; *see also id.* ("Potential uses in the middle zone include walking and biking trails, a range of trail surfaces, limited parking, and restroom facilities.").  The erosion controls, replanting, and revegetation would prevent non-point source pollution during and after construction.  *See supra* 14–16.[5]

*Second*, EPA contends it observed during a September 2021 visit that the Property "had been disturbed by clear cutting the tree canopy and foliage, soil grading, and soil compaction."  Smith Decl., Ex. N at 14.  As discussed above, a limited number of trees were removed, and those trees were far from the streambank. The GAP also contemplates soil grading and compaction for hard-surface trails.  *See* GAP § 8.6.3.3(B) ("Concrete trails are built on graded, compacted subbase . . . .").  Consistency with the GAP's multi-use trail design guidelines and revegetation of the Property would adequately ensure the Project is protective of water quality.

*Third*, EPA for the first time contends that it "identified erosion and non-point pollution concerns associated with construction" and "the silt fencing in place did

---

[5] Although the GAP does not require the trail modifications that EPA has demanded, EPA's approval of the trail is a tacit admission that the Project is protective of water quality.  EPA's concerns relating to the clearing of trees and vegetation are cured.

not adequately protect against erosion and that the hay cover on the cleared area had decomposed." Smith Decl., Ex. N at 14. Despite EPA's and EPD's "agreement to use their best efforts to expeditiously review and comment on all" approval requests, CD § XIX(B), EPA's visit occurred over four months after the City's request, Smith Decl., Ex. C. EPA's belated observations cannot support penalties EPA contends relate to construction from January to April 2021. Even so, EPA does not assert it observed evidence of actual non-point pollution or discharges into Proctor Creek. If it had, EPA could have contacted the City. Instead, it waited another seven months to notify the City of Project disapproval—a notice that did not mention these issues.

*Fourth*, EPA alleges the bridge "encroaches on and directs heavy, non-motorized traffic through the environmentally sensitive inner and riparian buffer zones approaching the creek," and, relatedly, the City "constructed the bridge's footings within the 50-foot 'inner zone'" that is "suitable only for soft-surface footpaths and limited water access." Smith Decl., Ex. N at 14. The GAP provides explicitly that "buffer zones and setbacks" simply "provide guidance" and "the City is not bound by" the guidance. GAP § 8.4. Even so, the GAP allows for bridges, GAP § 8.6.2.5, that necessarily will bring traffic near water sources; and the bridge extends close to the 50-foot setback line from Proctor Creek so that almost none of the trail will be within that area and individuals will be directed over—rather than through—the area. Smith Decl., Exs. C at 8, H at 5. The GAP's referenced Standard

Operating Procedures ("SOP"), *see* GAP § 8.6.1, similarly provide that facilities should have a 50-foot setback "[e]xcept for perpendicular . . . crossings," GAP, App. N § 5.2, which makes sense because bridges by definition cross the water source. The bridge "would not by itself contribute non-point source pollution into Proctor Creek" because the bridge's "90% angle provides for the shortest span possible, which minimizes the impact to Proctor Creek," and revegetation "will reduce and/or completely eliminate non-point source pollution from being transferred from the bridge by foot traffic and entering Proctor Creek."  Kung'u Decl. ¶ 16.

*Fifth*, EPA argues the City "filled in the streambank with riprap, thus failing to keep the Property in a natural state where the crossing is perpendicular to the creek."  Smith Decl., Ex. N at 15.  Riprap—a layer of stones—provides erosion control and stabilizes the streambank, which is particularly true under a bridge where vegetation growth is difficult to sustain.  Kung'u Decl. ¶ 18.  The City used riprap to prevent erosion, thereby protecting water quality.  *Id.*  Indeed, the GAP's SOPs recognize that stabilization measures can include "riprap."  GAP, App. M § 6.0.

EPA has failed to demonstrate that the Project was designed and constructed without non-point source pollution prevention as a primary consideration.

### B.    The Consent Decree Permits Retroactive Approval.

The Consent Decree reasonably encompasses retroactive approval and certainly does not unambiguously mandate pre-approval.  The decree requires that

"[l]ocation and construction of [public access] facilities shall be subject to the approval of EPA/EPD."  CD § VIII(D)(2)(n).  "Approval" is a flexible term that encompasses pre- and retroactive approval.  The provision provides no temporal aspect for seeking approval, which stands in marked contrast to other provisions that require submission for EPA and EPD "review and approval *before* the [City]" may act.  CD § VIII(D)(2)(f) (emphasis added); *see also* CD § VII(A)(3)(b) ("Upon receiving EPA/EPD's final approval, the [City] shall implement . . . .").  Indeed, the parties agreed stipulated penalties may be assessed under another public access provision if the City exceeds the 10% limitation "without *prior* approval."  CD § XI(I)(4) (emphasis added).  If the parties had wanted to require pre-approval here, they would have said so.  The Court should "not impose obligations on a party that are not unambiguously mandated by the decree itself."  *Reynolds*, 202 F.3d at 1312.

EPA incorrectly argues it would be "illogical" to read the Consent Decree as allowing anything other than "pre-approval" because such a reading would prevent EPA's and EPD's input.  Smith Decl., Ex. N at 17.  The City is charged with reviewing LDAs, which includes assessing erosion and sediment control plans using best management practices to protect, among other things, water quality.  *See supra* 14.  The GAP provides the City with flexible guidelines to ensure the design and construction of facilities prevents non-point source pollution.  *See supra* 5–6.  If a project complies with the GAP, EPA and EPD can provide retroactive approval.  If

EPA and EPD believe a project violates the GAP, the parties can work together to implement remedial measures (as EPA contends it did here). Retroactive approval comports with the Consent Decree's plain language and harmonizes the City's rights subject to certain approval rights.

C.     <u>EPA Cannot Unreasonably Withhold Approval.</u>

EPA's denial of approval was unreasonable because the Project complied with the GAP; the Consent Decree does not allow for a languid approval process subject to EPA's preferences that leaves the City unable to meaningfully pursue important public access projects. EPA must exercise approval rights reasonably. Restatement (Second) of Contracts § 228; 13 Williston on Contracts § 38:22 (4th ed.); *see also Jeda Capital-56, LLC v. Lowe's Home Ctrs., Inc.*, 2013 U.S. Dist. LEXIS 141978, at *17 (N.D.N.Y. Sept. 30, 2013). While the Consent Decree envisions oversight by EPA and EPD, its single sentence referencing approval does not divest land use planning rights and responsibilities from the City.[6] Site selection and facility design on its properties are basic land use functions that fall within the City's expertise and its rights and obligations to its constituents. The GAP provides flexible "guidelines" to the City to inform decision-making based on site-specific conditions and user needs, GAP § 8.6.1, including by not restricting the City to buffer zones but allowing

---

[6] EPA argues that review of the approval process is "moot" because EPA belatedly approved the trail, Smith Decl., Ex. N at 22, but the standards by which EPA could reject or approve the Project in its original form remain live issues.

them to "guide the City" in its "review of setback variance requests" that it can grant in its "best professional judgment," GAP § 8.4.  EPA's preferences for a soft-surface trail to limit traffic are not mandated by the GAP, GAP § 8.6, and cannot support refusing approval where the trail is protective of water quality, *see supra* 14–16.[7]

EPA also could not withhold approval of the Project on the basis that it must comply with the 2010 Letter, Smith Decl., Ex. N at 24–25, because that letter did not modify the Consent Decree.  The Consent Decree provides:  "Any modification of this Consent Decree by the parties shall be in writing and approved by the Court before it will be deemed effective."  CD § XXI.  "[M]inor changes which do not significantly alter the remedial action to be conducted by the [City]," however, "may be made by the parties, provided such changes are agreed upon in writing by all parties to this Consent Decree."  *Id.*  The 2010 Letter requiring the City to provide "compelling evidence" for hard-surfaced trails—a burden strikingly different from the GAP's "preferences"—and imposing new "design criteria," Smith Decl., Ex. M, plainly "significantly alter[s] the remedial action" by creating new restrictions on Greenway Properties, thereby requiring Court approval.  CD § XXI.  Even if the new rules could be construed as "[m]inor changes," the 2010 Letter still did not modify the Consent Decree because "all parties to this Consent Decree" did not agree upon

---

[7] The same holds true for EPA's new argument that it prefers "alternative route[s]" outside of the Property.  Smith Decl., Ex. N at 21.  Withholding approval because EPA prefers the City use non-greenway properties would gut public access benefits.

the changes in writing. *Id.* The City responded with counterproposals and asked "**whether** and how to incorporate" the rules into the GAP, thereby showing the City had not agreed upon changes. Smith Decl., Ex. AA (emphasis added). Nor did all plaintiffs that are party to the Consent Decree, *see* CD § III, agree in writing.

## III. A $485,000 Penalty Would Be Unenforceable Even if the Consent Decree Did Require Pre-Approval.

Even if the Consent Decree did unambiguously mandate pre-approval, *but see supra* 19–21, a draconian $485,000 penalty would be unenforceable as wildly disproportionate to the harm—if any—caused by a non-material violation.

Penalties that bear no relation to the resulting harm are unenforceable. Parties may fix damages "only at an amount that is reasonable in light of the anticipated or actual loss caused by the breach." Restatement (Second) of Contracts § 356(1). Applying this principle, a District of Delaware court held penalties in a consent decree were "void and unenforceable" where the "penalties sought by the EPA [bore] no relation to the degree of harm caused by" the conduct. *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 530 (D. Del. 1999). The court concluded that EPA's $1.2 million demanded penalty was not "a reasonable measure of harm caused by noncompliance with the decree" where "neither the EPA nor the environment [were] being harmed" by delayed payment. *Id.* at 530–31. Courts regularly apply similar state contract principles. *See Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1351 (11th Cir. 2000) (unenforceable penalty where

"Plaintiff has not asserted that he has even been inconvenienced or suffered loss from the breach"); *S. Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 856 (7th Cir. 1999) (license surrender penalty was "an unenforceable penalty" for "technical" rather than "substantive" violation of a consent decree); *see also Caincare, Inc. v. Ellison*, 272 Ga. App. 190, 194–95 (2005) ("unenforceable penalty" where "[n]o justification" for amounts).

The City's retroactive approval request for a Project that meets the guidelines of the GAP and is protective of water quality at most presents a non-material violation that does not harm the environment or undermine the SEP. Because "neither the EPA nor the environment are being harmed," $485,000 in penalties "bear no relation to the degree of harm." *Witco*, 76 F. Supp. 2d at 530–31.[8] The penalty provision thus does "not establish a reasonable measure of harm caused by noncompliance with the decree" and is "void and unenforceable" in these circumstances. *Id.* at 531; *accord Resnick*, 227 F.3d at 1351; *Berry*, 186 F.3d at 856; *Ellison*, 272 Ga. App. at 194–95. This is particularly appropriate because EPA unilaterally rejected approval in contravention of the Consent Decree, CD § XIX(C), and failed to "expeditiously review" the City's request, CD § XIX(B).

---

[8] This Court recognized that the 33 U.S.C. § 1319(d) factors, which include "the seriousness of the violation," "are presumably factored into the amount of the stipulated penalties." *Upper Chattahoochee Riverkeeper Fund v. City of Atlanta*, 98 F. Supp. 2d 1380, 1384 & n.3 (N.D. Ga. 2000).

## IV.    The Consent Decree Does Not Allow Interest to Be Imposed Here.

The Consent Decree does not permit interest even if it authorized a penalty. Without providing notice that EPA and EPD had assigned retroactive approval review to EPA, *see* CD § XIX(C), EPA requested on April 8, 2022 that the City make payment "within 30 days of receiving this letter."[9]  Smith Decl., Ex. D.  EPD informed the City it believes a penalty is inappropriate because the Consent Decree allows for retroactive approval.  Because EPA and EPD have provided the City "with inconsistent positions," "the [City]'s obligation to perform an action affected by the inconsistent position shall be stayed until the dispute is resolved."  CD § XIII(G).

EPA's unreasonable conduct also vitiates any claim to interest.  The City requested EPA rescind the penalty in June 2022.  EPA then failed to "expeditiously review" multiple proposals while it considered the penalty request.  CD § XIX(B). After waiting 341 days to respond initially, EPA delayed an additional 120 and 136 days, respectively, on modified proposals.  It was not until April 2023 that it became clear EPA would not rescind the penalty.  EPA never opened the door for meaningful negotiation or wavered from its demand.  The Court should disallow interest.

## <u>CONCLUSION</u>

The City requests the Court enter an order declaring that the Consent Decree does not allow EPA's demanded stipulated penalty or interest.

---

[9] Payment thus would have been due on May 18, 2022.  *See* CD §§ XI(O), XX.

Respectfully submitted, this 20th day of September, 2023.

/s/ W. Alex Smith
Thomas E. Reilly (GA Bar No. 600195)
W. Alex Smith (GA Bar No. 532647)
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
T: (404) 885-3000
F: (404) 885-3900
tom.reilly@troutman.com
alex.smith@troutman.com


/s/ Susan H. Richardson
Susan H. Richardson (GA Bar No. 342562)
Kilpatrick Townsend & Stockton
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
T: (404) 815-6330
F: (404) 815-6555
srichardson@kilpatricktownsend.com

Counsel for
Defendant the City of Atlanta

26

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D) of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1.

This 20th day of September, 2023.

*/s/ W. Alex Smith*
W. Alex Smith (GA Bar No. 532647)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 20th day of September, 2023 electronically filed the foregoing DEFENDANT THE CITY OF ATLANTA'S BRIEF IN SUPPORT OF ITS PETITION FOR REVIEW OF PLAINTIFF THE UNITED STATES OF AMERICA'S WRITTEN RESPONSE AND DEMAND OF STIPULATED PENALTIES with the Clerk of Court using the CM/ECF system, which will automatically serve notification of such filing to all counsel of record.

*/s/ W. Alex Smith*
W. Alex Smith (GA Bar No. 532647)